The next case for argument is 17-1667 Olimanestianu v. United States The next case for argument is 17-1677 So these sister circuits essentially ignored those rules. And we think there's a very doctrinally simple and consistent way to get to the result of no taking in those cases while remaining faithful to the Supreme Court's precedent on how to identify a cognizable property interest. And here it is. These cases all present regulatory takings. Claims were not impaired. They were simply appropriated. I mean, they were not impaired. Claims were not appropriated. They were simply impaired. And the Supreme Court recently explained in Horn that personal properties such as a claim can be subject to virtually limitless regulation without running afoul of the takings clause. And that's certainly the case with a claim where the government controls things like jurisdiction, forum, statute of limitations, things like that. It can regulate claims in all kinds of different ways. So we think the proper way to dispose of a takings dispute arising out of the government's interference or preclusion of a claim is to do so within the regulatory taking paradigm. Essentially what this court just did last month in aviation. We don't think the federal circuit should essentially abandon what we think is its correct precedent and follow its sister circuits in drawing an artificial distinction between claims and other forms of intangible property. Moving on to the second point. We think that the per se categorical rules of Horn apply here. And that's because the taking here was an appropriation. The claims of the Almonestiano plaintiffs were espoused. They were transferred to the government and the government used them however they wanted to use them. And that's the key distinction between this case and aviation. They were really interfered with in two ways. I mean the settlement agreement, the transfer of the money and the reestablishment of sovereign immunity all happened before the official espousal. I don't think that's right. I think that the claims were espoused by the government when it appropriated them and used them when it settled the claims. The government didn't have the authority to do that. If you look at the settlement agreement, it says nothing about espousal. No, I think if you look at appendix page 30, what the settlement agreement says is that under article three, each party, meaning the government, shall accept the resources for distribution as a full and final settlement of its claims and suits and those of its nationals. It wouldn't have the authority to do that unless it had already appropriated the claims. Shall accept the resources for distribution. So I think that article three, the government could not do that unless it had appropriated the claims. It had no right to stand in our shoes and agree to that unless and until it had appropriated the claims. And that I think is the key distinction between our case and the aviation case. The plaintiffs in aviation, they still have their claims. They could go to another forum if one were available and use them. We don't. The government took our claims. And the government even admitted that they appropriated the claims. That's what they told the D.C. Circuit. They told the D.C. Circuit that, this is the quote, in espousing the claims against Libya, the United States has made plaintiff's claims its own. And that brings us to Horn. Horn holds in stark terms that when the government appropriates protected property, regardless of type, it has affected a categorical taking and must pay just compensation. So when it comes to appropriations, the Supreme Court explained that the Fifth Amendment, quote, protects private property without any distinction between different types. Horn essentially reminds the lower courts that the cumbersome interest and expectations balancing required under the Penn Central Lucas regulatory paradigm just has no place in the face of an actual appropriation. Essentially, the Supreme Court is signaling to the lower courts that they're working too hard here. So the syllogism that was rejected in Abraham-Urey is the precise syllogism that the Supreme Court mandated in Horn. When the government appropriates protected property, it must pay just compensation, period. The government's expressed concern that if the court were to find a taking here, it would have some sort of drastic and harmful impact on their foreign relations. We think that's a bit alarmist. The government can very effectively resolve claims against foreign governments without taking them, taking possession of those claims. We know that because they did just that in connection with the claims that it resolved for the aviation plaintiffs. What it really needs is just clear guidance from the courts as to what the rules are, what the takings clause allows them to do, and what it doesn't, without paying just compensation. So in aviation, the claims weren't seized and compromised. They were just regulated. Libya's sovereign immunity was restored. And in doing so, that stripped the federal courts of jurisdiction, and they couldn't prosecute their claims anymore. And that's why this court in aviation adjudicated that dispute within the regulatory paradigm. But here, to resolve the claims against Libya, the government actually appropriated them. And how the government goes about exercising its extraordinary powers matters. In Horn, the dissent pointed out that the government could have achieved essentially the same ends by simply regulating or taxing the raising growers. But the court rejected the argument, and Justice Roberts went on a bit of a lecture in writing for the court. He wrote that, quote, the Constitution, however, is concerned with means as well as ends. The government has broad powers, but the means it uses to achieve its ends must be consistent with the letter and spirit of the Constitution. And I'm hard-pressed to think of anything less consistent with the letter and spirit of the Constitution than the government's position that they could take possession of, use, and appropriate and benefit from the claims of its citizens without paying just compensation. I just want to quickly touch upon the justiciability point. In aviation, the court held that essentially the exact case here, the question of whether a taking occurs when the government espouses a claim against a foreign power, is justiciable. So we think that's the same case here. And I think I'll reserve the balance of my time. Thank you. Good morning, and may it please the court. The court should affirm the trial court's judgment in this case. There are three reasons why. First... Before you get into the argument, could you just quickly respond to the Article 3 argument your adversary made a moment ago? This is in the settlement agreement. This is a question of whether or not the settlement agreement actually espouses the claims or whether the actual espousal in this case came later in the lawsuit. Right. And it is true that the settlement agreement does resolve and settle these claims. But I'd like to explain why it doesn't matter here. It doesn't matter because the district court lawsuit was dismissed months later. And that seems to be what they assert as the property interest, their legal claims against Libya and the non-final judgment. That non-final judgment... I'm just talking about the official espousal. Right. Well, the announcement of the official espousal occurred after Libya's sovereign immunity was reinstated. What was the effect of Article 3 to espouse the claim? They had been settled, yes, in the settlement agreement. Okay. But it doesn't matter because when their district court lawsuit was dismissed, it was dismissed not just because the claims were espoused but also because Libya possessed sovereign immunity at that time. And so there are two reasons why they don't have a property interest here. First, they don't have any cognizable property interest in rules of sovereign immunity. Those rules can change at any time. And, in fact, here obviously they did. At the time the injury occurred here, the bombing occurred, Libya possessed sovereign immunity for acts of state-sponsored terror. That changed in the mid-'90s, and then it changed again approximately 10 years later. So that's the first reason why they don't have a cognizable property interest. But the second reason is that they don't have a property interest in their legal claim, period. Now, we recognize, and a number of courts have held that, particularly with respect to tort claims, but we recognize that this court in Adams did draw some exceptions to that bright-line rule. And what the court said in Adams is that claims can be property if they protect legally recognized property interests, that is, real property, physical property, or intellectual property. These underlying tort claims don't fall within the ambit of Adams. They're not real property, they're not physical property, and they're not intellectual property. Are those three the only underlying claims that could support the taking? Well, to our knowledge, there are no cases broadening that definition at all. And we respectfully submit that if you do begin to broaden it, then the exception, in essence, swallows the rule, particularly if we're talking about common law tort claims, as we are here. And I'd also add the gloss onto that. For example, say a final judgment. Well, that could potentially be different. We do think there are certain circumstances, at least in the context of international affairs, where the government, the president, and Congress could espouse and settle even final judgments without affecting a taking. But we recognize that a number of courts have drawn a distinction there and said that property rights do become vested once they become subject to a final judgment. But we do think international affairs and international claims are a different animal, so to speak. Now, I'd like to turn to the question. In addition to the fact that the plaintiffs don't possess a cognizable property interest here, no taking actually occurred. The plaintiffs rely heavily upon the recent Supreme Court decision in Horn. But Horn, first, much of what they rely on is dict in Horn. Horn, though, didn't address the circumstances here. The case that does address the circumstances here is Abraham-Urey. And what this court said in Abraham-Urey is that even to the extent that- You earlier said with regard to the property interest, international claims are a different animal. That's basically your answer. Right, exactly. And that's where I answer- On the takings issue. Right. That's right, Your Honor. And what this court said in Abraham-Urey is that even to the extent that we're talking about property, certain property comes with inherent limitations. And that if you obtain a claim against a foreign state, you do so with the inherent knowledge that that claim could be settled. In terms of taking jurisprudence, international claims are sort of mongrels. I think that's fair to say, yes, Your Honor. And, of course, the concurring opinion in Abraham-Urey makes that point that just because- So what do you do under Abraham-Urey? You're allowed to use Penn Central factors to inform your judgment about whether or not a taking took place? I think that's right. But Lucas and Lucas is what teaches you that international claims are a different animal? I think that's right. I would characterize it slightly differently. I think the analysis is really looking at what is the property interest here, and do they actually have any sort of right in this respect? Is it a- Let's leave that aside for a moment and assume for purposes of argument that we decide that there is a property interest, whether we say we're bound to that by Abraham-Urey or otherwise, or as in the recent case, we allied the issue and assume it. Then why is it that we ignore Horne? Well, Horne, number one, doesn't talk about international claims, obviously. Okay. And you can- If Horne had been a case where, let's say, the government had grown the raisins in Horne and then gave those raisins to the Hornes and said, you can use these raisins, but we may take them back at any time, and against that backdrop, we have a long history going back to the founding of the nation of the government actually taking back raisins. That would then put Horne more like our case, but that's not what Horne is about. Horne doesn't talk about international claims. It doesn't talk about the fact that when parties obtain a claim against a foreign country, they do so with the knowledge, the inherent knowledge, that that claim may be settled and espoused at any time, that, in essence, any rights that they have take a backseat to the rights of the executive. And here, it was not just the executive but also Congress, obviously, to settle and resolve claims in the interest of international relations. Is it your understanding of your adversary's position that if we reject their per se argument, then they concede or they don't have an argument against an analysis under Abraham Urey? They haven't seemed to challenge our analysis of the Penn Central factors in their briefs yet. Perhaps if this is a Lucas-type case, then at least with regard to the three or four people who got no recovery at all, it's a total taking? Well, that is what they argue, right? They say it's a per se taking, but, again, Abraham Urey rejected the argument that just because there's a per se taking, that that's the end of the inquiry. You have to, in essence, look at— Well, it's a question—I mean, I suppose the question is saying, well, you don't— do you use outside of a Loretto physical occupation coming in and sort of occupying the real estate and the regulatory side? You have Penn Central on the one hand and Lucas on the other, right? Right. I think that's generally true. But what the court said in Abraham Urey is that even if there is a per se taking, you may not, in essence, have owned the rights that are alleged to have been taken in that circumstance. You never have the unfettered right or the unfettered ability to sue a foreign country. But that grant, which Congress granted, obviously, after the injury took place here, that grant is contingent and can be taken back at any time. To what extent is the reference in Urey to a sufficient remedy that the government supplies you on the other hand? How significant is that? Well, it's not. In fact, in the Belk case, which is another espousal case, there the case involved individuals who had been held hostage by Iran, and at the time they were afforded no compensation. Their claims were espoused, like here, and they were not provided any sort of alternative forum. And what the court in Belk said, this court said, is that the failure to provide any sort of alternative forum doesn't make a taking. And also, if the court is going to... If that's the case, then what was the office, what was the job that was being done by the portion of the Urey opinion that talks about the other remedy and it being quite sufficient? Right, well, I think the court was just noting that in that case, there was an alternative forum that was provided, and that certainly provided an additional reason for why no taking occurred. That's true here as well. The family collectively received approximately... It's here for the members of the family that got something, but not for the estates of the two brothers. Right, yes, that's true. And the widow. Right, and... On her own. Right, and now, respectfully, Your Honor, I think we're treading into, in the aviation case, what the court said is, although it's just the question of whether or not a taking occurred is justiciable, the decision to settle claims and how the settlement proceeds are actually distributed is not a justiciable inquiry because there are no judicially manageable standards for the court to evaluate. And obviously... Do you think the reasons why the brothers' estates were excluded or not given any consideration or that the widow's claim was rolled back into her estate claim fall into non-justiciability? We do, Your Honor, respectfully, yes. But I can tell you that... That specific point wasn't brief. This discussion you and I are having now was not in the briefs, right? Well, we... Justiciability for these two separate points. Well, we did make the point, Your Honor, that in terms of justiciability, it's at page 52 of our brief, I believe, we did make the point that, in fact, the distinction between challenging the espousal and challenging what the commission did here is not a distinction in this case because they have many references to the commission's decision to provide payment to certain individuals and not others. Is your bottom line simply that we're bound by Abraham-Urey? Yes, I think that's right. Because you don't view Horne to be specific enough in talking to this environment? That's right, Your Honor. And again, if Horne had talked about a situation where if I'm the government and I see that someone... their pen isn't working and I say to them, you can use my pen for the rest of the day, and at the end of the day they don't give it back and I, the government, take that pen back, that's not a taking, and that's what happened here with respect to international claims. As the court in aviation said, what Congress giveth, Congress can taketh away, and that's what happened here, both Congress and the executive obviously acting in conjunction. So we respectfully request that the court affirm the trial court's decision. Just a few quick points. The government wants the court to do what Horne says it may not. The government, the Supreme Court in Horne said that when there's an appropriation, you don't look at expectations, you don't go beyond the text of the Constitution that says essentially that private property shall not be taken for public use without just compensation. Horne said don't look at the Lucas factors in the face of an appropriation, and he's telling you, he's telling this court to look at the Lucas factors, and that's not what Horne allows the courts to do here. This is a complete deprivation. Moving on to his other point. Aren't there reasons why a court might draw a line between international claims and domestic claims? Sorry, can you repeat the question? Isn't there a reason why a court might draw a line between domestic claims and international claims? I think where that line may come into play. Is sovereign immunity involved at all in domestic claims? I think where that line may come into play is with respect to what just compensation might be, the last part of the takings analysis, because perhaps claims against the sovereign might be less valuable than claims against Microsoft in certain ways because of certain immunities that they may have. But in terms of the property interest itself and which box you're in in terms of the analysis, I don't think so. A claim isn't less of a property interest because it's against a foreign sovereign. The claim is the claim. Its character is not any different. There might be different rules. Well, the question is whether it can be taken without compensation. I think that there's a recognition in Abraham Urey that there was a dispossession of a property interest. Abraham Urey says that the court shows in action was a property interest, right? Correct. And it was taken. Correct. And that decision by Abraham Urey that there was a property interest to me doesn't strike me as dictum because it was necessary for the decision. You wouldn't have had a decision on whether or not there was a taking of it unless there had been a viable property interest. So you have it now? Correct. I think Abraham Urey would have controlled this case prior to Horn. And under Abraham Urey, as the court noted, you were very much in the Lucas box. And I think that the test that the court seemed to apply. Assuming for purposes of argument that we reject your view that Horn requires us to analyze this as a per se taking Loretto with giving no benefit, no consideration of the fact that it's international. What's left of your case? I think that under Abraham Urey, the test there was essentially you look at whether the plaintiff's recovery, how they did was just in light of the circumstances. Did they do about as well as could have been expected? And that's why the court in Abraham Urey said the plaintiffs there did pretty well. They got 100 percent of the principle on their claims and they got most of the interest. And they said, given the problems you are facing with trying to get your claims resolved by this arbitration panel, you did great. You have nothing to complain about. You couldn't have expected to do any better. But that's not the case here. Here, as the court noted, four of the plaintiffs. But doesn't Abraham Urey say that Penn Central considerations are pertinent? I think the considerations, I think that it might have mentioned Penn Central, but it seemed to employ very much. The court of claims had turned the case on Penn Central. The lead argument was that that was legal error. That you couldn't do that. That Loretto applied. It was a per se taking. And the court in Abraham Urey did not say, oh, the district court erred by using Penn Central analysis. In fact, it said they're pertinent. Sure. I think it did. But certainly the thrust of the opinion was very Lucas-centric. It didn't look at the host of factors that you really are supposed to look at under Penn Central. It looked at a very narrow set of factors. More like a Lucas analysis. So I think in terms of the analysis employed by the court, I think it was very much a Lucas analysis. And I think that that's the analysis that makes sense given the rules that the Supreme Court set up, which require that when there's essentially a complete deprivation of a right. What about Belk? In Belk, the individuals who had been incarcerated in Iran brought their lawsuit, came away with nothing. I think Belk preceded Lucas. So I think that to the extent that Lucas, the Belk analysis applied, it preceded Lucas. So the Lucas rules that the court, I think, employed in Abraham Urey didn't exist when Belk was decided. So there was kind of a different tool kit that was available to the federal circuit prior to Lucas. Because Belk was a 1988 case. Final thought. What? Final thought. Your time's up. I think that's all I have. Thank you, Your Honor. Thank you. We thank both sides. The case is submitted. That concludes our discussion for this morning. All rise.